UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAYVON THOMAS,

                Petitioner,

    -vs-

ANTHONY F. ZON, Wende Correctional
Facility,

                Respondent.
_____

**DECISION AND ORDER**
**No. 04-CV-0471(VEB)**

## I.      Introduction

*Pro se* petitioner Jayvon Thomas ("Thomas" or "petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254 challenging his conviction on charges of intentional murder (N.Y. Penal Law § 125.25(1)) and related charges. The parties consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.      Mootness

Following the preparation of the instant Decision and Order, but before it was filed, the Court received information indicating that Thomas had died on February 26, 2007, a month after the consent order was entered in this case. Respondent did not notify the Court at the time of petitioner's death.  Because the only relief Thomas seeks in his habeas petition is release state custody on the basis that his conviction was obtained unconstitutionally, his death means that there is no relief that this Court can grant to him, *see, e.g., Calderon v. Moore*, 518 U.S. 149, 150 (1996) (citation omitted), his petition for a writ of habeas corpus has been rendered moot. *Accord, e.g., Garceau v. Woodard*, 399 F.3d 1101, 1101 (9ᵗʰ Cir. 2005) (dismissing 28 U.S.C. §

2254 habeas petition as moot where petitioner died while in custody); *Griffey v. Lindsey*, 349

F.3d 1157. 1157 (9th Cir. 2003) (dismissing 28 U.S.C. § 2254 habeas petition as moot where

petitioner died while in custody); *Rivera v. Pearlman*, No. 02 Civ. 2399(LAK), 2004 WL

533333, at *1 (S.D.N.Y. Mar. 16, 2004) (dismissing habeas petition brought under 28 U.S.C. §

2241(c) where petitioner died after he filed the petition; petition was mooted since there was no

relief that could be granted to him). Therefore, dismissal of the petition is warranted on the basis

that it is moot.

## III.    Merits of the Petition

Even had the petition not been mooted by Thomas' death, it did not present any

meritorious habeas claims as discussed more fully below.

### A.    Factual Background and Procedural History

Thomas was indicted by an Erie County Grand Jury in connection with a shooting on the

night of December 5, 1998, outside the Spotlight Bar in the City of Buffalo. Sean Franklin

("Franklin") died after receiving a bullet to the head. Ronnie Dupree ("Dupree") was shot in both

legs and spent a night and a half in the hospital. The indictment charged Thomas with two

theories of murder (intentional murder under N.Y. Penal Law § 125.25(1) and depraved

indifference under N.Y. Penal Law § 125.25(2)), as well as one count each of second degree

attempted murder (N.Y. Penal Law §§ 110.00, 125.25(1)), first degree attempted assault (N.Y.

Penal Law §§ 110.00, 120.10(1)), second degree assault (N.Y. Penal Law § 120.05(2)), first

degree criminal use of a firearm (N.Y. Penal Law § 265.09(1)(a)), and second degree criminal

possession of a weapon (N.Y. Penal Law § 265.03).[1]   Thomas' jury trial was conducted in Erie County Supreme Court (Wolfgang, J.), A summary of the relevant trial testimony follows.

On December 5, 1998, Dupree and Franklin were two of many patrons at the Spotlight Bar in the City of Buffalo's Riverside Community. It was generally known that there was going to be trouble at the Spotlight that evening between "the Shaffers" and "the Jaspers," two rival groups of individuals, named after the two housing communities in Buffalo in which the members lived. Thomas was associated with the Shaffers, the decedent Franklyn's group. *See* T.423, 457, 468, 470, 631, 651.[2]

Various witnesses, such as Shedrick Edwards ("Edwards"), saw Thomas in the company of his brother, Diandre Richardson ("Richardson", a/k/a "TJ"), Steven Pena ("Pena") and Monique Brown ("Brown"). *See* T.496, 504, 508. Thomas was being social, talking with Dupree and Jamal Brannon (a/k/a "Bump"). *See* T.631-32, 665-66. One of the victims, Dupree, said that he was sitting next to petitioner, whom he knew as "Bubba," and talking with him. T.781, 783, 784, 819.  Many witnesses, such as Tianna Poole ("Poole") had not known petitioner prior to the incident. *See* T.105, 168, 169, 658.

The Spotlight was crowded. According to Brannon, a/k/a "Bump", who was associated with the Shaffers, there was "mad tension," meaning "lots of tension," in the bar. T480, 658. Brannon was the boyfriend of Latrina Mays ("Mays"). T.627.[3] Mays, on the night before the

---

[1]     Also indicted Thomas was a woman named Monique Brown. Brown was charged with criminal possession of weapon in the third degree (N.Y. Penal Law § 265.02(4)) and criminal facilitation in the fourth degree (N.Y. Penal Law § 115.0(l)). Eyewitnesses claimed that they saw her give petitioner a gun prior to the shooting. However, the trial court subsequently dismissed charges against Brown pursuant to C.P.L. § 290.10.

[2]     Citations to "T.__" refer to the trial transcript.

[3]     Although he was Mays' boyfriend, Brannon was at the same time having an affair with Darcy Perez ("Perez"), who was married to Pena. T.624-25, 294-95.

shooting, had been involved in a fight with the girlfriend of Lewis Anders ("Anders"), and had

some jewelry taken from her. T.652-53. Brannon admitted that he went to the Spotlight

anticipating a fight, and that he told one of the detectives that he went in order to make sure that

Mays "got a fair fight." T.651-54, 670.  Brannon said that Anders (whose girlfriend had fought

Mays), Pena, and Franklin (the decedent) were associated with the Jasper group. Brannon and

his friends were in the Shaffer group. T384, 407. Brannon stated that just before the shooting, he

had apparently started to walk with Robert Jones, a friend of the decedent's, towards Evelyn

Street, to discuss how they could diffuse the situation. According to Brannon, he was afraid that

something more than a fistfight would take place between the two groups. T.670.

 Damone Tillman ("Tillman"), a member of the Shaffers, said that the decedent, Franklin,

was intoxicated, and started to knock the balls off the pool table after members of the Jasper and

the Shaffer groups began to mix. T.479. Matters came to a head after Poole and Perez arrived at

the bar. T.182, 183, 185, 193. Perez and her husband, Pena, had a confrontation outside the bar

about ten to fifteen minutes before the shooting. T.472, 475. Tillman stated that immediately

after the showdown between Perez and Pena, petitioner had asked Tillman, "are you hauling, do

you got a strap or something like that."  T.457. Petitioner was asking whether Tillman was

carrying a gun. Petitioner said to Tillman, "well if anything happen [sic] I do and he lifted up his

shirt and showed me a gun." T.457-60. Petitioner displayed a .38-caliber gun tucked into his belt.

*See* T.457-59, 460, 483.

 At some point, a bunch of people exited the bar; among them were Franklin; his cousin,

Mark Irving; Dupree; and petitioner. Poole testified that Franklin took off black leather coat and

handed it to Richardson, a/k/a, TJ. T.114. Richardson/TJ was petitioner's brother. Franklin said

to Joel Jennings (a/k/a "Scooty"), who was in Brannon's group, "We can do it, right?" T.114, 116, 222.

Shortly thereafter, Edwards testified, "shots rang out." T.393. The shooter "emptied the whole clip" and the shots were "rapid, one after another." T.393. Edwards looked towards the payphone and said, "I seen Bubba [i.e., petitioner] shooting" with the gun "pointed towards Bump and them [i.e., the victims]." T.393-94. At the time, Franklin, the decedent, was two to three feet away from petitioner. Edwards saw both Dupree and Franklin fall to the ground. T.396.

Edwards said that the shooter put the decedent's black leather jacket over his hand and begin shooting towards Evelyn Street. T.433-34. Edwards saw Dupree and the decedent fall but did not see how the decedent had been shot. T.396, 397, 432. (Dupree was shot twice in the leg and Franklin was shot in the forehead.)

Edwards said that petitioner then turned around the corner onto Philadelphia; Edwards did not see him after that. T.399. Edwards testified that he had not had any problems with petitioner prior to the shooting. T.398. Edwards testified that about 5 to 10 minutes before the shooting began, he saw Brown (Thomas' former co-defendant) "pass" petitioner a gun. T.388, 412.

Poole, who had come to the bar with Perez, saw petitioner just before the shooting started. Poole observed the Shaffers and the Jaspers squaring off outside the bar and claimed that she was concerned for the decedent's safety. T.120. Poole recalled that petitioner was pointing a gun down the street but she could not say that he was pointing the gun at Franklin. T.92, 98, 99, 102, 105, 118. Petitioner was standing only a few feet from Poole, who was able to observe him

for about 10 to 15 seconds. Poole heard gunshots and then saw Franklin on the ground. Poole did not see anyone else besides petitioner with a gun that night. T.91-96, 98-99, 102, 103, 118.

Mark Irving ("Irving") said that he heard gunshots and saw petitioner shoot at Franklin from about three feet away. T.317-18, 370.  Irving said that petitioner was leaning by the payphone next to the bar, with his back towards Philadelphia Street. T.91, 92, 119, 313, 787-89. Franklin was standing on one side of the fire hydrant facing Dupree and his friends, who were on the other side of the fire hydrant. T.322-23. Irving said that the shooting came from behind the payphone and petitioner was on the side of the payphone reaching his arm around the front of it. T.319. Petitioner pulled his gun out and, without moving his body or his arm, shot first towards Evelyn Street. and, after a shot or two, towards the decedent, Franklin. T.321, 324, 343. When the shooting started, Irving backed up against the bar and called the decedent, who turned, as though he was going to run, and then fell. Irving did not know that Dupree had been shot. T.321. After Franklin fell to the ground, Irving heard four to five more shots. T.325.[4]

Tracy Epperson ("Epperson") said that it appeared that decedent and the other victim, Dupree, were about to fight each other. T. 151, 154, 186, 188. Epperson testified that the decedent was standing in the company of Dupree and others near the payphone facing Philadelphia Street. T.153-55, 186-89. Epperson saw petitioner approach from around the corner of Philadelphia and Ontario. Petitioner started shooting from a position in the street; he was aiming in the direction of Eveyln Street. T.156-57.[5]  Epperson then saw that Franklin, the

---

[4]      At the crime scene, the police discovered Irving rifling through the decedent's pockets. Irving also had drugs in his hands. T.567, 590. The police at first considered Irving to be the shooter. T.329.

[5]      According to the defense, this "appear[ed] to be where Irving put[ ] Diandre Richardson [petitioner's brother]." Petitioner's Appellate Brief, Respondent's Exhibit B.

decedent, was on the ground. T.156- 58. According to Epperson, no one else had a gun besides petitioner. T.164. Epperson did not see Franklin actually get shot.

Michael Jackson ("Jackson"), one of the decedent's brothers, saw the shooting through the window of the bar. Jackson said that he saw Franklin making hand gestures, waving his hand to and fro. T.223, 224. Franklin turned towards Philadelphia street, where TJ, Pena, Perez, Irving, and Poole were standing. T.224. The shots came from the corner of Philadelphia street. Jackson saw petitioner holding the gun and shooting. T.225-26. Franklin was only about two to three feet away from petitioner when he was shot. T.223, 225, 228, 232, 263. Jackson testified that he had seen petitioner before that night. T.296.

Dupree said that, as he and the decedent Franklin spoke to each other, petitioner pointed a black handgun towards him. Petitioner was standing about ten feet away from Dupree. Franklin was in the middle, facing Dupree, about five feet away from both petitioner and Dupree, who stood on either side of him. T.790-93. Petitioner pointed the gun straight out from his body and shot Dupree in the back of his leg. Dupree fell and jumped back up and started running. Dupree related that as Franklin turned towards petitioner, he was shot in the head. T.790-91.

As Dupree ran towards Evelyn Street, he was shot in the kneecap of the other leg and he fell again, but he got up once more. T.794. Dupree also felt two bullets go through the back of his jacket and come out at the collar. T.798-800, Dupree did not suffer injury to his shoulder or upper body. T.836-37.[6]

Several Buffalo Police officers parked about two car lengths from the corner of Ontario and Philadelphia Streets, with a clear view of the Spotlight bar, saw matters beginning to

---

[6]       On the night of the shooting, Dupree had told Detective Masecchia that he could not identify anybody as the shooter. T.535. Later, however, Dupree identified petitioner as the gunman. T.500.

escalate in the group outside the bar. The officers heard shouting and decided to intervene. Before they could exit their vehicle, they heard six to seven shots. T.555, 556, 560, 576. Officer Figueroa said that he heard six to eight shots with a slight pause between the first three shots and the rest. He could not see where the shooting was coming from. T.596, 597, 598. Although the rapid fire of the shots he heard was more consistent with more than one gun being fired though there was nothing in the nature of the gunshots to lead him to believe that more than one gun was fired that night. T.604-07.

Officer Figueroa testified that he and his partner chased Pena and another man. Although his partner was able to capture Pena, Officer Figueroa eventually gave up the chase with regard to the man he was pursuing. T.562-64, 574, 585-88. When Officer Figueroa saw the "wanted" bulletin for petitioner, he realized that petitioner was the man he had chased on the night of the shooting.

Petitioner fled the scene and left his jacket with Franklin's younger brother, Rodney Bell ("Bell"), at Franklin's house across the street. T.104, 163, 608, 611-12. Bell testified that around 2:00 a.m. on December 6, 1998, he heard about eight gunshots. Five minutes later the doorbell rang and Bell and his mother went to the door. T.608, 609, 616. A young, black male, whom Bell had never seen before and could not then identify as petitioner, T.614, 621, was at the door. Bell said that the man was wearing a blue jacket and a skullcap-hat. T.614-15. To Bell, the man appeared to be nervous. The man said that his cousin had just been shot at the bar. He then asked for a ride home to the east side of Buffalo. T.611, 612, 616, 617, 618.  Bell's mother told him to invite the man into the hall. T.612,619. When the visitor was informed that the Bells could not give him a ride home, the man took off his jacket and hat, dropped them on the floor, and asked

Bell to hold them. When Bell turned to talk to his mother, the man had disappeared. T.612, 617. The next day Bell's mother gave the police the jacket. T.491-92, 613. Epperson and Brown both identified the jacket as belonging to petitioner. T.498, 510, 527.

The prosecution introduced testimony of an admission by petitioner, made to David Holloway ("Holloway"), petitioner's co-defendant on unrelated armed robbery charges. Holloway related that on April 23, 1999, he and the petitioner were hiding in the attic of Holloway's house from the police. T.870-74. Holloway recalled that petitioner was very nervous and emotional. He confided to Holloway that he was involved in a serious matter and that his whole life was over. T.875, 883, 887. After they were arrested, Holloway said, petitioner made the sign of "187", which, Holloway explained, was "street code" for "murder." T.875, 877.

Holloway testified that prior to their participating in a lineup the next day, petitioner told Holloway that he had been at a bar and had shot two people one of whom had died. T.877, 886. Holloway did not see the Crime Stoppers episode on television that aired about the Spotlight Bar shooting, and learned independently that petitioner had been charged with murder in that case. T.887.

The jury found petitioner guilty of intentional murder, acquitted him of depraved indifference murder, and found him guilty of attempted murder and each of the remaining assault and weapons-possession charges.

Sentencing was scheduled for April 18, 2000. Prior to that, Thomas filed a *pro se* motion to set aside the verdict pursuant to C.P.L. § 330.30, stating that there had been "misconduct of a juror." The motion did not specify the nature of the misconduct nor did it allege any facts. Thomas told the trial court that "we sat right here in front of a jury of twelve, one of the jurors

stay [sic] asleep. Where [sic] he came back with a guilty verdict, how was that? [I] don't understand it. S.6. The trial judge did not agree with Thomas' claim, noting that "twelve people who were listening to this trial, and we saw them, and who deliberated this case thought the proof was sufficient." S.7.

The trial court proceeded to sentence petitioner to an indeterminate term of imprisonment of 20 years to life for the murder count, determinate terms of 20 years for the attempted murder and criminal use of a firearm counts, a determinate term of 7 years for the assault count, and determinate terms of 15 years for the attempted assault and weapons-possession counts. All terms were set to run concurrently with each other.

On direct appeal, the Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed Thomas' conviction on November 15, 2002. *People v. Thomas*, 299 A.D.2d 942, 750 N.Y.S.2d 4167 (App. Div. 4th Dept. 2002). The Appellate Division held that the verdict was not against the weight of the evidence, and that Thomas was not denied the effective assistance of trial counsel. The court stated that "'[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met[.]" *Id.* (quoting *People v. Baldi*, 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893 (N.Y. 1981) and citing *People v. Benevento*, 91 N.Y.2d 708, 711-713, 674 N.Y.S.2d 629 (N.Y. 1998).

The Appellate Division further held that Thomas had  failed to preserve for review his contentions that the conviction of assault in the second degree (N.Y. Penal Law § 120.05(2)) and criminal possession of a weapon in the second degree (former N.Y. Penal Law § 265.03) must be

vacated because those crimes were lesser included offenses of other crimes of which he was convicted. *Id.* at 942 (citing N.Y. CRIM. PROC. LAW § 470.05(2)). The court held that, in any event, the claims were without merit because "[w]ith respect to each count, the greater offense could be committed without concomitantly committing the lesser offense, and thus neither is a lesser included offense of the greater offense[.]" *Id.* (citing *People v. Glover*, 567 N.Y.2d 61, 63 (N.Y. 1982) ("To establish entitlement to a lesser included offense charge, the defendant must make two showings. First, it must be shown that the additional offense that he desires to have charged is a 'lesser included offense', i.e., that it is an offense of lesser grade or degree and that in all circumstances, not only in those presented in the particular case, it is impossible to commit the greater crime without concomitantly, by the same conduct, committing the lesser offense. That established, the defendant must then show that there is a reasonable view of the evidence in the particular case that would support a finding that he committed the lesser offense but not the greater.").

The Appellate Division also found a lack of preservation with regard to Thomas' claim that a juror was asleep during the trial. *Id.* (citing N.Y. CRIM. PROC. LAW § 470.05(2); *People v. Gray*, 86 N.Y.2d 10, 19 (N.Y. 1995) (rejecting defendants' arguments that at most, a general motion to dismiss is all that is necessary in order to claim that the evidence of knowledge of weight is insufficient for a conviction)). However, the Appellate Division reviewed the claim on the merits and determined that the record did not support Thomas' contention. *Id.* (citing *People v. Pulley*, 290 A.D.2d 321, 321-22, 735 N.Y.S.2d 778 (App. Div. 1st Dept. 2002) ("The court properly exercised its discretion in denying defendant's mistrial motion made on the ground that some jurors had allegedly been sleeping during the court's charge. Defendant failed to preserve

his contention that the court should have conducted a further inquiry of the purported sleeping

jurors, and we decline to review it in the interest of justice. Were we to review this claim we

would find that the court's inquiry, coupled with its own observations, was sufficient to establish

that none of the jurors missed any of the proceedings . . . .") (further citations omitted). Finally,

the Appellate Division concluded, Thomas' sentence was "neither unduly harsh nor severe." *Id.*

Leave to appeal to the New York Court of Appeals was denied on February 27, 2003. *People v.*

*Thomas*, 99 N.Y.2d 620 (N.Y. 2003).

In papers dated November 21, 2000, Thomas moved before the trial court to have his

conviction vacated pursuant to New York Criminal Procedure Law ("C.P.L.") §§ 440.10 and

440.30, alleging that his trial attorney did not afford him effective assistance of counsel. In a

memorandum and order dated April 11, 2001, the trial court denied the motion without a

hearing. Thomas brought a second C.P.L. § 440.10 motion dated March 2, 2003, in which he

argued that there was newly-discovered evidence that he was not the shooter. The trial court

denied his motion in a memorandum and order dated June 16, 2003. Thomas' application for

permission to appeal to the Appellate Division was denied on September 10, 2003.

Thomas' petition raises the following claims: juror misconduct, ineffective assistance of

trial counsel, and that the verdict was against the weight of the credible evidence. In his

opposition memorandum of law, respondent argues that several of Thomas' claims are

procedurally defaulted and, in any event, all of the claims are without merit. *See* Docket Nos. 4

& 5. Thomas filed a reply memorandum of law (Docket No. 6) in which he provided further

argument as to why his claims are meritorious, but he did not address respondent's assertion of

the affirmative defense of procedural default. Thomas also asks for a reconstruction hearing to be

held with regard to the issue of the allegedly sleeping juror.

For the reasons that follow, Thomas' petition for a writ of habeas corpus is denied.

**B.      Standard of Review**

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**C.      Procedural Default**

**1.      General Principles**

A court considering a habeas petition may not review claims based on federal law if the last state court to consider the claims "clearly and expressly rel[ied] on an independent and adequate state ground," such as a procedural bar. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991); *see also Garcia v. Lewis*, 188 F.3d 71, 76 (2d Cir.1999). "This rule applies whether the state law ground is substantive or procedural." *Id.* (citations omitted). The independent and adequate state ground doctrine may bar federal habeas review "when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement" for in such cases "the state judgment rests on independent and adequate state procedural grounds." *Id.* (citing, *inter alia*, *Wainwright v. Sykes*, 433 U.S. 72, 81, 87 (1977)).  To foreclose federal review "the last state court to render judgment must clearly and expressly state ... that its judgment rest[ed] on a state procedural bar." *Jones v. Vacco*, 126 F.3d 408, 415 (2d

Cir.1997) (internal quotation and citation omitted).  The prohibition applies "even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir.1990).

The Second Circuit has made clear that the state appellate court must "actually state[ ]" that an "issue was not preserved" to bar federal habeas  review. *Jones*, 229 F.3d at 118. A party's "failure to make objections at trial constitutes adequate procedural default under [New York Criminal Procedure Law] section 470.05[2]," *Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir.1999) (citing *Fernandez v. Leonardo*, 931 F.2d 214, 216 (2d Cir.1991)), and such default constitutes an "adequate bar to federal habeas  review." *Id.*  (citing *Bossett v. Walker*, 41 F.3d 825, 829 n. 2 (2d Cir.1994)).In order for a state law ground to be considered adequate to support the state court's judgment, it must be "'firmly established and regularly followed' in the state." *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir.2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).

A finding of procedural default precludes federal habeas review of the federal claim, unless the habeas petitioner can show "cause" for the default and "prejudice" attributable thereto, *Murray v. Carrier*, 477 U.S. 478, 485 (1986), or demonstrate that the failure to consider the federal claim on habeas will result in a  "fundamental miscarriage of justice,'" *id.* at 495 (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)). To be sufficient to excuse a procedural default "cause" must be something external to the petitioner, something that cannot fairly be attributed to him. *Id.* In other words, demonstrating cause "must ordinarily turn on whether the prisoner can show that some "objective factor external to the defense" impeded counsel's efforts to comply with the state's procedural rule. *Id.* at 488. (giving, as examples of "external factors," a demonstration that the "the factual or legal basis for a claim was not reasonably available to

counsel" or that "some interference by officials . . .made compliance impracticable"). Attorney ignorance, mistake, or inadvertence is not "cause" because the attorney is the petitioner's agent when he acts–or fails to act–in furtherance of the criminal proceeding, and, accordingly, the petitioner bears the risk of attorney error. *Coleman*, 501 U.S. at 753 (citing *Murray*, 477 U.S. at 488). Attorney error that arises to ineffective assistance within the meaning of the Sixth Amendment may constitute cause, but only if it amounts to an independent constitutional violation. *Id.*; *accord Edwards v. Carpenter*, 529 U.S. 446 (2000).

The "prejudice" prong requires that the petitioner show "actual prejudice," *McCleskey*, 499 U.S. at 493, "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual  and substantial disadvantage, infecting his entire trial with error of constitutional dimensions,"  *United States v. Frady*, 456 U.S. 152, 170  (1982) (discussing cause and prejudice  test required for collateral relief pursuant to 28 U.S.C. § 2255 where error not raised at trial or on direct appeal); *accord*, *e.g.*, *Murray v. Carrier*, 477 U.S. at 493; *McCleskey v. Zan*t, 499 U.S. 467, 494 (1991); *Bousley v. United States*, 523 U.S. 614, 630 (1998); *Massaro v. United States*, 538 U.S. 500, 503 (2003).

### 2.        Petitioner's juror misconduct claim is procedurally defaulted

The sole basis for this claim is Thomas' post-trial assertion during the sentencing hearing that a juror was asleep at trial. Notably, neither petitioner, nor his attorney, nor the prosecutor, nor the trial judge expressed any concern that a juror was asleep during the trial. All of these individuals clearly had the jurors in plain view during the entire proceeding, and there is no reason for Thomas not to have raised the issue during the trial, when the court could have taken steps to rectify any possible problem.

On appeal, the Appellate Division rejected Thomas' claim that the case should have been remanded for a reconstruction hearing to ascertain whether a juror was sleeping during his trial because he failed to fulfill the preservation requirement as codified in New York's contemporaneous objection rule, C.P.L.§ 470.05(2).[7] The Appellate Division also ruled that the claim was without merit, having no support in the record.

New York's rule requiring preservation of errors for appellate review has been held to be an independent and adequate state law ground by the Second Circuit. *Garcia v. Lewis*, 188 F.3d 71 (2d Cir. 1999). The Appellate Division's consideration of the merits of Thomas' juror misconduct claim in the alternative does not affect the adequacy or the independence of its ruling resting on the state procedural rule of  contemporaneous preservation. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("Moreover, a state court need not fear reaching the merits of a federal claim in an alternative  holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.") (citing *Fox Film Corp. v. Muller*, 296 U.S. 207, 210 (1935)). Thus, even though the Appellate Division alternatively found the juror misconduct claim to be meritless, it expressly relied upon an adequate and independent state ground for its finding that a procedural bar existed to appellate review. This Court is therefore proscribed from reviewing the juror claim unless Thomas can

---

[7]        In order to preserve a question for appeal under New York law, the party claiming error must register a protest at trial or at a proceeding and either (a) the objecting party must make his or her position on the issue in question known to the trial court or (b) the trial court must actually decide the question that is being raised on appeal. N.Y. CRIM. PROC. LAW § 470.05(2). In order to preserve an issue for appeal, a general objection is not sufficient; lather the criminal defendant "must specifically focus on the alleged error." *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007). "New York courts consistently interpret [C.P.L.] § 470.05(2) to require that a defendant specify the grounds of alleged error in sufficient detail so that the trial court may have a fair opportunity to rectify any error." *Id.* at 709 (citing *People v. McLane*, 682 N.Y.S.2d 24, 25 (App. Div. 1st Dept. 1998).

demonstrate cause, actual prejudice or a fundamental miscarriage of justice. Thomas makes no

such allegations, and the record does not support a finding of cause and prejudice, or that he is

actually innocent. Accordingly, this claim is dismissed as procedurally defaulted from federal

habeas review.

    **D.**      **Analysis of the Petition's Remaining Claims**

           **1.**      **The claim of ineffective assistance of trial counsel (Ground II) is without merit.**

In order to prevail on a claim of ineffective assistance of counsel, petitioner must show

both that counsel's performance fell below the objective standards of reasonableness dictated by

prevailing professional norms, and that there is a reasonable probability that, but for counsel's

deficient performance, the outcome of the proceedings would have been different. *Strickland*

*v. Washington*, 466 U.S. 668, 687-88 (1984). There is a strong presumption that counsel's

conduct fell within the wide range of reasonable professional assistance. *Id.* at 689. A

petitioner must overcome the presumption that, under the circumstances, the challenged action

might be considered sound trial strategy.

           **a.**      **Failure to Pursue a Justification Defense**

In his petition, Thomas does not provide specifics regarding this claim of ineffectiveness.

In his reply memorandum of law, all he offers in support of this claim is that a Lewis Anders

alleged knew of "plots and plans for a vengeful attack . . . as well as the justification of the

matter." The Court therefore reviewed appellate counsel's brief submitted on direct appeal in an

attempt to flesh out this claim. Appellate counsel pointed to the "long-standing hostile relations

between the Jasper and Shaffer groups" and the "mad tension" in the bar that night. Appellate

counsel also claimed that the decedent was in danger from the other shooting victim, Dupree,

and Jennings, who were associated with Brannon's group, and argued that "if indeed [petitioner] did fire the gun, he did so in defense of another who unfortunately got in the path of fire and was killed.." Appellate counsel did not ever spell out who the "other" person was that Thomas allegedly was defending; he seemed to suggest that it actually was the decedent.  Appellate counsel's argument on this point is nothing more than "smoke and mirrors." The argument requires a series of contortions of the evidence that still does not place one in the position to even infer that Thomas was acting in defense of "another." In any event, the Appellate Division rejected this claim on the merits, ruling that Thomas "failed to demonstrate the absence of a strategic reason for defense counsel's failure to present a justification defense," and noting that "the defense presented by defense counsel was that the eyewitnesses had mistakenly identified defendant."  *People v. Thomas*, 299 A.D.2d at 942, 750 N.Y.S.2d at 418 (citation omitted).

As an initial matter, the Supreme Court has instructed habeas courts to "apply[ ] a heavy measure of deference to counsel's judgments," and "[i]n any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances," *Strickland*, 466 U.S. at 691. Respondent argue that Thomas' claim that trial counsel should have developed testimony on certain witnesses' cross-examination in support of a justification defense is based on speculation that the prosecution witnesses would have supported such a defense, and it is impossible to conclude on this record that any favorable testimony  supporting a justification defense could have been elicited by defense counsel. Indeed, it would appear that the evidence presented at trial negated such a defense. The only individual in the bar who was seen with a gun was petitioner. Contrary to appellate counsel's suggestion, when the shooting took place, there was no proof that petitioner was acting in the defense of a third person.

Rather than pursue a justification defense based on surmise, defense counsel elected instead to question whether the witnesses had properly identified the defendant as the shooter. To the extent that a justification defense would have required petitioner to admit to the shooting, such a defense would have conflicted with the chosen strategy of arguing mistaken identity–that Thomas was not involved in the shooting and that the eyewitnesses who testified against him were unreliable or had motives to falsely identify him. Defense counsel argued that where certain witnesses said the shooter was standing in a location more consistent with where petitioner's brother had been observed, and said that some of the witnesses were not reliable because they did not know petitioner beforehand.

However, it is "true . . . that a justification defense was not absolutely precluded by [Thomas'] misidentification theory." *Horton v. Ercole*, 557 F. Supp.2d 308, 316 (N.D.N.Y. 2008) (citing *People v. Steele*, 26 N.Y.2d 526, 529, 311 N.Y.S.2d 889 (N.Y.1970) (assertion of alibi defense does not preclude justification defense); *People v. Butts*, 72 N.Y.2d 746, 748, 536 N.Y.S.2d 730 (N.Y.1988) ( "It is established New York case law that a defendant's entitlement to a charge on a claimed defense is not defeated solely by reason of its inconsistency with some other defense raised or even with the defendant's outright denial that he was involved in the crime.")).  However, "0trial counsel could reasonably have concluded that the two defenses were inconsistent and that to assert justification would have undermined the misidentification defense." *Horton*, 557 F. Supp.2d at 316. *See also Spragion v. Smith*, NO. CV-04-1880(FB), 2005 WL 3535158, at *6 (E.D.N.Y. Dec. 23, 2005) (rejecting claim of ineffective assistance of trial counsel based on pursuit of a defense of mistaken identity, rather than attempting to convince the jury that the shooting was accidental). Moreover, as discussed above, the only

-19-

"evidence" to support a justification defense required the factfinder to place inference upon tenuous inference. Thomas' claim represents nothing more than an attack on the trial strategy employed by defense counsel and is therefore an insufficient basis to conclude that counsel was ineffective.

Furthermore, trial counsel's decision to pursue a defense of mistaken identity, rather than attempt to convince the jury that the shooting was accidental, was not unreasonable. "We will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential downside.' Thus, [a] lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (citations and quotation marks omitted). It was not unreasonable for trial counsel to refrain from expending time and efforts on investigations not calculated to uncover evidence that would support the defense presented at trial. *Accord Spragion v. Smith*, 2005 WL 3535158, at *6. While a mistaken identity defense allowed the jury to return a verdict of not guilty on all counts, an assertion that the shooting was in self-defense would not have provided a defense to weapons possession charges in the indictment. *Id.* Where, as here, "[a]n attorney who presents a well-grounded, but ultimately unsuccessful defense, will not later be held to have provided ineffective assistance of counsel." *Gatto v. Hoke*, 809 F. Supp. 1030, 1039 (E.D.N.Y.) (citing *Trapnell v. United States*, 725 F.2d 149, 155 (2d Cir.1983) ("We have repeatedly noted our reluctance to second-guess matters of trial strategy simply because the chosen strategy was not successful.") (citations omitted)), *aff'd without opn.*, 986 F.2d 500 (2d Cir. 1992).

-20-

**b.      Failure to allow petitioner to testify**

The Supreme Court has held that a defendant in a criminal case has the right to testify on

his own behalf. *Rock v. Arkansas*, 483 U.S. 44, 49 (1987).  That right is a "personal" right and

can only be waived by the defendant himself. *Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir.1997).

The Supreme Court has stated that the right to testify is "a necessary corollary to the Fifth

Amendment's guarantee against compelled testimony." *Rock v. Arkansas*, 483 U.S. at 52

(quoting *Harris v. New York*, 401 U.S. 222, 225 (1971) ("Every criminal defendant is privileged

to testify in his own defense, or to refuse to do so.")). Thomas is correct that, consequently, "the

defendant must be allowed to testify if he so desires, regardless of strategic considerations that

his lawyer concludes weigh against such a decision." *Id.* I do note that federal courts have held

that efforts by defense counsel to dissuade the defendant from taking the stand are consistent

with *Strickland. See*, *e.g.*, *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992) ("If

counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed

should, advise the client in the strongest possible terms not to testify.").

In any event, Thomas' claim must fail. I note that Thomas does not ever state in his

habeas petition or reply memorandum of law that trial counsel failed to inform him of his right to

testify. Rather, this appears to be the typical case in which, after discussing the issue, Thomas'

counsel advised against testifying and petitioner eventually took that advice. At the sentencing

hearing, petitioner stated that "they [sic] denied me, they said don't get on the stand." S.6.[8] He

does not clarify who the "they" is, but it is most probable Thomas is referring to his counsel.

In hindsight, Thomas is now convinced that his testimony would have resulted in a more

---

[8]        Citations to "S.__" refer to the transcript of the sentencing hearing.

favorable verdict. However, he has failed to demonstrate how this is the case, and he therefore has failed to meet his burden of demonstrating that he suffered constitutional prejudice as a result of failing to testify. Thomas' petition and reply memorandum of law are devoid of any offer of proof or indication as to how his testimony would have changed the result of the trial. *See Brown v. Artuz*, 124 F.3d at 81 (finding that even where petitioner made a proffer as to what he would have testified at trial, and "[e]ven if [petitioner] had made such statements on the stand, . . . , there is no reasonable probability that the verdict would have been different").  All that appellate counsel argued on direct appeal was that *if* Thomas had wanted to testify, and he was denied that opportunity, then he was treated as though the determination of the matter was ultimately not his own. Tellingly, Thomas' own appellate counsel did not set forth the allegedly favorable testimony that Thomas was supposedly prevented from giving. The complete failure of Thomas to ever provide specifics as to how he would have assisted his defense fatally undermines his claim. *See id.*

In *Brown v. Artuz*, the petitioner wanted to take the stand to testify in support of a justification defense that, in relevant part, he had a real well-founded fear of the decedent as a result of a number of previous unrelated altercations between them, and that the decedent had threatened his life on more than one occasion in the past as a result of defendant's refusal to lend him money. *Brown*, 124 F.3d at 80-81. The Second Circuit found that even if Brown had made such statements on the stand, there was "no reasonable probability that the verdict would have been different" in light of New York law's law governing a defendant's use deadly force to defend himself. *Id.* at 81 (citing N.Y. PENAL LAW § 35.15(1)-(2)). As the Second Circuit noted, deadly force is justified "only if, among other things, (1) [the defendant] subjectively believes

that the use of dadly force is necessary, (2) a reasonable person in defendant's position would

believe that the use of deadly force is necessary, and (3) the defendant does not 'know [ ] that he

can with complete safety as to himself and others avoid the necessity of [using deadly force] by

retreating.'" 124 F.3d at 81 (quoting N.Y. PENAL LAW § 35.15(1)-(2) and citing *generally People*

*v. Goetz*, 68 N.Y.2d 96, 506 N.Y.S.2d 18 (N.Y. 1986)). The Second Circuit held that "[a]lthough

Brown's purported testimony would have supported the first element, and perhaps the second as

well, nothing in his offer of proof would have been sufficient to support a reasonable inference in

his favor on the third element of the justification defense." *Id.*

Likewise, in this case, Thomas has not explained to the Court how he could have put

forward even a colorable showing on *any* of the elements of the justification statute. This

prevents Thomas from showing prejudice as a result of his failure to testify, because the only

basis for assessing how the trial's outcome would have been different is Thomas' speculative

and unsubstantiated assertions. Because Thomas cannot meet the prejudice prong of *Strickland*, I

need not address whether trial counsel's performance was constitutionally deficient.

### c. Failure to request a missing witness charge

Thomas argues that trial counsel should have requested a missing witness charge for the

following individuals: Diandre Richardson, Tameka Curtis ("Curtis"), Lewis Anders, and Robert

Jones. Richardson, Thomas' brother, admittedly was present during the incident. Tameka Curtis

was friends with a woman named Barbara Ramos ("Ramos"); they had both been at the Spotlight

Bar but left  because they did not like the atmosphere. According to Ramos, the men at the

Spotlight were telling each other to "Put your gatz up," meaning "Put your guns up." T.45-51,

66. She testified that Curtis, a girlfriend of the decedent's brother, was so nervous about what

she feared was about to happen at the Spotlight that she spilled a whole pitcher of beer while

they were at Denny's Bar, where they had gone after leaving the Spotlight. According to Ramos,

because Curtis was nervous, she (Ramos) called 911 and told the operator that she had seen

someone leaving the bar with a gun, even though she had not seen anyone with a gun at the

Spotlight. She had only told the 911 operator about a gun so that the police would respond

quickly. T.50, 51, 52, 63, 72.  Lewis Anders' connection to this whole imbroglio was his

girlfriend, who had been involved in a fight several days before with Brannon's girlfriend, Mays.

Finally, Robert Jones was the person with whom Brannon allegedly had the conversation about

trying to de-escalate the situation. Noticeably absent from petitioner's petition or his appellate

brief is any indication as to how these individuals purportedly would have testified, much less

how their testimony would have helped the defense. Thus, Thomas could not show at trial, nor

can he show now, that the witnesses who were not called "would have provided noncumulative

testimony which was *favorable* to him[.]" *People v. Durham*, 248 A.D.2d 820, 823, 670

N.Y.S.2d 235 (App. Div. 3d Dept. 1998) (emphasis added).  Therefore, as a matter of New York

state law, there was no basis for such a charge given the facts presented at trial. *Id.*; *see also*

*People v. Miller*, 235 A.D.2d 568, 570-571, 652 N.Y.S.2d 790 (App. Div. 3d Dept. 1997);

*People v. Kitching*, 78 N.Y.2d 532, 536, 577 N.Y.S.2d 231 (N.Y. 1991). Where, as here, there

was no record support for a missing witness instruction, it cannot be unreasonable for trial

counsel to decline to request such an instruction. Moreover, because Thomas has never

explained how these "missing" witnesses would have helped his case, he cannot show that he

was prejudiced by trial counsel's failure to request a missing witness charge with regard to them.

### d.       Failure to object to improper comments by the prosecutor

Thomas asserts that the prosecutor impermissibly argued to the jury that Thomas was

acting as a "hit man" on behalf of Pena, whose wife was having an affair with Brannon (a/k/a

"Bump"), "to take care of the little problem that Steve was having with Bump." T.995.[9] The

prosecutor said that former co-defendant Brown told the police that petitioner came to the bar

with Pena. The prosecutor suggested that petitioner "was brought in to do the job precisely for

the reason that nobody knew him" and it would be better for him, rather than, Franklin, for

example, to do the shooting. *See* T.995; *see also* Petitioner's Appellate Brief, Respondent's

Exhibit B. Petitioner's appellate counsel took issue with these remarks, asserting that Brown did

not say in her police statement that petitioner had come to the bar with Pena and his brother.

Appellate counsel also complained that the prosecution "adduced no evidence of a conspiracy on

behalf of the decedent and his group to harm Bump and his group or any evidence to show that

the appellant was brought up to the Spotlight under a contract or agreement to kill between

appellant and Steve Pena or the terms of such contract or conspiracy."

---

[9]       The following passage from the prosecutor's summation was objected to by appellate counsel:

And I think it's become pretty clear through the testimony of the witnesses that Bump and Ronnie
Dupree and his crowd weren't exactly liked by Sean Franklin and his friends. That's the conflict
there. You know that he came to the bar with Steve Pena and his brother, because that's what
Monique Brown told the police . . . . I submit to you that this defendant was brought in to do the
job precisely for the reason that nobody knew him, precisely because if TJ had done the shooting
or if Sean had done the shooting . . .[h]e would have been less likely to get away with it. I submit
to you that he was brought up there as a friend of Steve Pena's to take care of the little problem
that Steve was having with Bump. Now we do not hear that from Darcy, do we? No, we don't.
Ladies and gentleman, I submit to you to think about that. If somebody you knew got killed
because of you, would you come forward and admit it? Not necessarily, no. We did not hear from
Steve Pena either. We heard from the people who were cooperative and helpful with the police.
But I submit to you it's clear that to bring somebody up to do this job, somebody that nobody
knows, they thought there may be a higher likelihood of success that way.

T.995.

On appeal, the state argued that the prosecutor's summation "was within the broad
bounds of permissible rhetorical comment" and that the prosecutor "was entitled to make an
argument concerning motive which was arguably supported by the proof." The Appellate
Division did not address the prosecutorial misconduct claim specifically but included it among
"defendant's remaining contentions with respect to defense counsel's alleged failure to provide
meaningful representation." *People v. Thomas*, 299 A.D.2d at 942. With regard to those
contentions, the Appellate Division "considered [them]. . . and conclude[d] [they] [we]re without
merit." *Id.*

"To determine whether the prosecutor's argument was improper, [the reviewing court]
must examine the statements in the context of the trial and the summation in its entirety." *United
States v. Thomas*, 377 F.3d 232, 244 (2d Cir. 2004) (citing *United States v. Resto*, 824 F.2d 210,
212 (2d Cir.1987). In the present case, even if the prosecutor's statement misinterpreted the
evidence regarding Brown's statement to police, "a single inaccurate comment during
summation is not grounds for habeas relief." *Roman v. Filion*, No. 04 CIV. 8022KMWAJP, 2005
WL 1383167, at *19 (S.D.N.Y. June 10, 2005) (citing *Tankleff v. Senkowski*, 135 F.3d 235,
251-53 (2d Cir. 1998) (finding that even a "particularly troubling" misstatement of a witness'
pre-trial testimony by the prosecutor during summation was not grounds for habeas relief where
the statement was short and fleeting); *United States v. Simons*, No. 96-1730, 129 F.3d 114, 1997
WL 701369, at *2 (2d Cir. Nov. 10, 1997) (unpublished opn.) ("It is a rare case in which
improper comments in the prosecutor's summation are so prejudicial that a new trial is
required.") (internal quotations omitted), *cert. denied*, 523 U.S. 1110 (1998)); *see also Bentley v.
Scully*, 41 F.3d 818, 825 (2d Cir. 1994) ("Because of the compelling evidence in the

prosecution's case against Bentley, as well as the fact that the prosecutor's summation comments were both brief and isolated, we find that Bentley has failed to demonstrate that the prosecutor's misconduct had a substantial or injurious effect or influence on the jury's verdict.").

Here, Thomas appears to be arguing that it was a significant whether he was actually seen by Brown going into the bar with Pena. However, this point seems to be rather immaterial since, as appellate counsel stated in his brief, petitioner *was* seen in Pena's group at times, and with decedent's group at others. Trial counsel also may have had a strategic reason for not objecting, to avoid highlighting the statement and giving credence to the importance of the prosecutor's motive argument. *See Gatto v. Hoke*, 809 F. Supp. at 1039 (finding that counsel's failure to object to the prosecutor's summation represents his tactical decision to avoid underscoring the prosecutor's statements so as to draw the jury's attention to them"). In addition, the trial court instructed the jury that counsel's arguments were just that–not evidence, and that the jury was exclusively responsible for determining what the facts were. In any event, any misstatement by the prosecutor as to Brown's narrative to the police was, in the context of the record as a whole, insubstantial and could not have affected the verdict. Therefore, Thomas was not prejudiced by counsel's failure to object.

Furthermore, the remainder of the prosecutor's challenged remarks were not out of bounds of permissible rhetorical comment. "What [petitioner] characterizes as misstatements of fact are really inferences drawn by the prosecutor from the evidence adduced at trial, albeit inferences differing from those which defense counsel would have drawn from the same evidence. Within broad limits, counsel for both sides are entitled to argue the inferences which they wish the jury to draw  from the evidence." *United States v. Dibrizzi*, 393 F.2d 642, 646 (2d

Cir. 1968) (citations omitted).  I note that this passage was the only one to which petitioner's

appellate counsel objected; counsel has not complained about other unfair tactics or improper

comments by the prosecutor. However, even if these comments were inappropriate,

"inappropriate prosecutorial comments, standing alone, [do] not justify a reviewing court to

reverse a criminal trial obtained in an otherwise fair proceeding." *United States v. Young*, 470

U.S. 1, 11-12 (1985).  "[I]nasmuch as the summation comments did not rise to the level of

constitutional error or reversible error under state law, petitioner was not prejudiced by counsel's

failure to object to them and counsel cannot be found to have been ineffective." *Arce v. Smith*,

710 F. Supp. 920, 926-27 (S.D.N.Y.), *aff'd*,  889 F.2d 1271 (2d Cir.1989), *cert. denied*,  495 U.S.

937 (1990).

     **e.**  **Failure to introduce evidence of the deal made by Holloway**

   As noted above, Holloway was a co-defendant of Thomas' in an unrelated case.

Holloway provided testimony that Thomas had admitted shooting two people at a bar and said

that one of them died. Thomas' appellate counsel argued on appeal that there supposedly was a

"deal" made between Holloway and the prosecution with regard to the unrelated robbery charges

in which he and Thomas were involved. He argued that trial counsel should have adduced proof

of the "full nature" of the cooperation Holloway gave to the prosecution. However, as

respondent has argued, there is no proof of any cooperation agreement in the record. Appellate

counsel conceded as much in his brief on direct appeal. Accordingly, Thomas cannot succeed in

showing either that trial counsel was unreasonable or that the outcome of the trial would have

been different but for this alleged error. *Cf. United States v. Florez*, 447 F.3d 145, 156 (2d

Cir.2006) (rejecting insufficiency-of-the-evidence claim where defendant challenged the

accomplices' credibility based on their plea agreements with the government and their long

histories of criminal and dishonest behavior)

> ### 2.   Petitioner's claim that the verdict was against the weight of the evidence (Ground III) is not cognizable on federal habeas review.

Thomas here argues, as he did on direct appeal, that the verdict was against the weight of

the evidence. Pet., ¶12(C); Pet'r Reply Mem. at 7 *et seq.*  Respondent asserts that "[h]abeas

corpus relief is not available to a petitioner challenging his state court conviction on the ground

that the conviction was against the weight of the evidence." Resp't Mem. at 10 (citing *Soto v.*

*LeFevre*, 651 F. Supp. 588, 592 (S.D.N.Y. 1986) (citing *Marshall v. Lonsberger*, 459 U.S. 422,

432-435 (1983)), *aff'd,* 812 F.2d 713 (2d Cir. 1987), *cert denied*, 482 U.S. 907 (1987)).  "Weight

of the evidence" claims derive from C.P.L. § 470.15(5), which permits an appellate court in New

York to reverse or modify a conviction where it determines "that a verdict of conviction

resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y.

CRIM. PROC. LAW § 470.15(5); *see also People v. Bleakley*, 69 N.Y.2d 490, 495, 515

N.Y.S.2d 761, 508 N.E.2d 672 (N.Y. 1987). Because Thomas' "weight of the evidence" claim is

grounded solely in New York State's criminal procedure statute, it is not cognizable on habeas

review. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the

petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law

or treaty"); Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal

court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the

United States."). Therefore, I find that it must be dismissed on the basis that is not a federal

constitutional issue amenable to review in this federal habeas proceeding. *Accord*, *e.g.*, *Ex parte*

*Craig*, 282 F. 138, 148 (2d Cir. 1922) (holding that "a writ of habeas corpus cannot be used to

review the weight of evidence . . ."), *aff'd*, 263 U.S. 255 (1923); *see also Horton v. Ercole*, 557 F. Supp.2d at 324 (same) *Garrett v. Perlman*, 438 F. Supp.2d 467, 470 (S.D.N.Y. 2006) (same).

In keeping with the principle that complaints of *pro se* petitioners are to be considered liberally in their favor, *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), some habeas courts have construed weight-of-the-evidence claims as insufficiency-of-the-evidence claims. *E.g.*, *Davis v. McLaughlin*, 122 F. Supp.2d 437, 441 (S.D.N.Y. 2000) (treating petitioner's claim that his conviction was against the weight of the evidence and that the prosecution did not prove his guilt beyond a reasonable doubt as "legal sufficiency" claim). Here, respondent has actually treated Thomas' petition as asserting a legal insufficiency claim rather than arguing it should be dismissed as a not-cognizable "weight of the evidence" claim. Nonetheless, even if the Court were to construe Thomas' petition liberally as raising a claim that the evidence was legally insufficient to support the verdict, habeas relief still would not be warranted.

A conviction will be found to be supported by sufficient evidence if, "'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). On habeas review, a court is not permitted to "'make its own subjective determination of guilt or innocence.'" *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir. 1999) (quoting *Herrera v. Collins,* 506 U.S. 390, 402 (1993)). It is well settled that the jury is exclusively responsible for determining a witness's credibility. *United States v. Strauss*, 999 F.2d at 696 (citations omitted). Where there is conflicting testimony at trial, the reviewing court "'defer[s] to

-30-

the jury's resolution of the witnesses' credibility.'" *United States v. Autuori*, 212 F.3d 105, 118

(2d Cir.2000) (quoting *United States v. Payton*, 159 F.3d 49, 56 (2d Cir.1998)). Thus, a

reviewing court is not permitted to reassess the fact-specific credibility judgments by juries or

weigh conflicting testimony. *See United States v. Giraldo*, 80 F.3d 667, 673 (2d Cir.) ("The

weight of the evidence is a matter for argument to the jury, not a ground for reversal on

appeal."), *cert. denied*, 519 U.S. 847 (1996); *see also Jackson v. Virginia*, 443 U.S. at 318-19.


Thomas was seen by six witnesses shooting a gun near the victim, who was on the

ground. Two of the witnesses actually saw petitioner shoot at the victim. Poole saw petitioner,

who was only a few feet from her, for about 10 to15 seconds; he was pointing a gun down the

street. She next heard gunshots and saw the victim on the ground. She did not see anyone else

with a gun that night. T.91-96, 98-99, 102, 103, 118. Epperson also saw petitioner shooting a

gun and then saw the victim on the ground. T.156- 58. Epperson said no one else had a gun

besides petitioner. T.164. Jackson, who was inside the bar, saw petitioner shooting the gun; the

victim, who was only two to three feet away from him, got shot. T.223, 225, 228, 232, 263.

Jackson had seen the defendant before. T.296.  Irving left the bar with Franklin, the decedent,

and saw petitioner nearby. T.312-13. Irving heard gunshots and saw petitioner shoot at the

victim three to four times from close range, about three feet away. T.317-18, 370. Irving saw the

victim fall and he then heard four to five more shots. T.325. Edwards saw Monique Brown pass

a gun to petitioner in the bar. T.388. After petitioner and Franklin left the bar, Edwards heard

shots and saw petitioner shooting in Franklin's direction. T.393-94. Dupree (the other victim)

and Franklin fell down. T.396.  Edwards had met petitioner before that night. T.407-08. Tillman

saw petitioner display a gun in the bar. T.457-58. Dupree said that when he was outside, he saw petitioner shooting a gun at him. As Dupree was hit in his leg, he saw Franklin turn towards petitioner. Franklin was then shot in the head. T.790, 841. Thomas fled the scene, apparently leaving his jacket with the decedent's brother at the decedent's house. T.104, 163, 611-12. Thomas also subsequently told Holloway that he was at a bar and shot two people, one of whom died. T.866, 877.

This was a case where the jury's decision primarily was a matter of choosing whether to believe the prosecution witnesses' version of events or to believe the version offered by the defense. *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir.1981). The witnesses' descriptions of the shooting were largely consistent with each other. To the extent that the descriptions of the shooting given by the various witnesses contained inconsistencies, that was a matter within the jury's purview. *See*, *e.g.*, *United States v. Autuori*, 212 F.3d at 118. The jury was entitled to credit the testimony of the prosecution's witnesses regarding the identity of the shooter, and this Court may not second guess the jury or substitute its view of witness credibility for that of the jury. *E.g.*, *United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006)

On the present record, Thomas has not borne the "heavy burden" required to successfully mount a habeas challenge to the legal sufficiency of the evidence supporting his conviction. Thomas' third claim accordingly is dismissed.

### 3.    The claim that the trial court erred in failure to charge lesser included offenses does not present a cognizable federal claim.

In the point-heading to his argument in his reply memorandum of law regarding his "weight of the evidence" claim, Thomas also mentions that the trial court improperly refused to charge lesser included offenses. However, he provides no facts amplifying this claim. And, respondent has not addressed it in his memorandum of law. It does not appear that it was ever exhausted in state court. However, district courts now have authority to deny, on the merits, unexhausted habeas claims. *See* 28 U.S.C. § 2254(b)(2). This is the appropriate route to take here.

Although the Supreme Court has held that due process requires a trial court to submit jury instructions regarding lesser-included offenses in capital cases, it "has expressly declined to consider whether such a requirement would apply in the non-capital context." *Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996) (citing *Beck v. Alabama*, 447 U.S. 625, 637-38, 638 n. 14 (1980); *Gilmore v. Taylor*, 508 U.S. 333, 361 (1993) (Blackmun, J., dissenting)). In *Jones*, the Second Circuit observed that "a decision interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases would involve the announcement of a new rule[.]" *Id.* For that reason, the Second Circuit held that *Teague v. Lane*, 489 U.S. 288 (1989),[10] precluded its consideration of the issue. *Id.* (citing *Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir. 1995) ("With the intercircuit split on whether the lack of a lesser included offense instruction in a noncapital case presents constitutional error, any finding of constitutional error

---

[10]        In *Teague*, the Supreme Court adopted the so-called "non-retroactivity doctrine" applicable on habeas review, holding that that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."

would create a new rule, inapplicable to the present case under *Teague*.")). The Second Circuit further held that neither of the two narrowly drawn exceptions to *Teague* applied since the lesser- included-offense rule "does not decriminalize a particular class of conduct, nor does it fall within that small core of 'watershed' rules requiring the observance of certain procedures that are implicit in the concept of ordered liberty." *Id.* (citing *Andrews v. Deland*, 943 F.2d 1162, 1187 (10th Cir. 1991) ("The rule [in *Beck*] is not such a 'watershed' rule as to fit within the second exception."), *cert. denied*, 502 U.S. 1110 (1992)). Thus, the Second Circuit in *Jones* effectively concluded that a claimed error in failing to include a lesser offense instruction in a non-capital case is not a cognizable claim in a habeas corpus proceeding. *Accord*, *e.g.*, *Sullivan v. O'Keefe*, No. 00 CIV. 2292(SAS), 2000 WL 1072304, at *5 (S.D.N.Y. Aug. 2, 2000). Consequently, even if he had exhausted it, Thomas' claim regarding the failure to charge lesser included offenses would be precluded from habeas review. It accordingly is dismissed.

## IV.   Conclusion

For the reasons stated above, petitioner Jayvon Thomas' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is moot, and it is also without merit. Accordingly, it is dismissed. A certificate of appealability shall not issue *See* 28 U.S.C. § 2253(c).

**IT IS SO ORDERED**.

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      March 6, 2009
            Buffalo, New York.